Cases 13-5150, 5685, and 5907, United States of America v. Demetrius Fields, Clinton-Lewis, and Martin-Lewis. Argument not to exceed 30 minutes to be shared by appellants and 30 minutes to be shared by appellees. Messrs. Stengel, McAfee, and Simmons for appellants. Good morning, your honors. Mike Stengel of the Memphis Fire here on behalf of Demetrius Fields. So what's the sentencing challenge? This is the sentencing challenge. Great. And very simply, the current law is fairly clear that you look to the plea agreement to determine whether the United States reserve sole discretion on whether to make a 5A1 or not. Okay, so we have that. We have that. Well, I think that that's the issue, is whether we have that or not. Sorry. It is, I would suggest from reading this court's cases that it's not always easy to determine whether you have that. And what's very unique in Mr. Fields' situation is that there was a stipulation that Mr. Fields provided substantial assistance to the United States, which the district court ultimately in sentencing described as extraordinary, and the United States, the prosecutor, agreed that was a fair description. It's Mr. Fields' position that once the government stipulated that he had provided substantial assistance, that they had an obligation in good faith to either make the motion or prove by a preponderance that there was a breach of the plea agreement. Well, you know, this plea agreement vests discretion. It didn't say shall or will, like we had in Lewinsky. Isn't that right? That's correct. So, you know, it was always understood that the government had discretion as to whether to file a 5K, but he got the benefits of the 5K anyway, so I'm kind of, from a district court judge's perspective, wondering, what's the point? I would disagree that he got the benefits of the 5K. Didn't the judge say that because of this extraordinary cooperation, I'm going to depart downward? Didn't he vary downward instead of giving him life imprisonment? He did vary downward. Well, that's what the 5K would have done. The 5K didn't bind the government recommended. The 5K would just give the judge a basis to depart downward, wouldn't it? That's correct. Is this a distinction that you would vary in the department? Is this a distinction without a difference? Is that what this comes down to? This court may well conclude that. Mr. Fields would disagree, in part due to what you said, that it's harmless error to not get a departure to which you're entitled, but instead get a bearance to the same amount. That would be harmless error. In other words, I'll even grant you that it's an error. The terms mean different things and they come at different times in the calculation, but wouldn't we always say harmless error? Not under the facts of this case. In most cases, I would say that they would. But in this case, the plea agreement provided that the government would make a specific sentencing recommendation as to a cap if it made the 5K-1, and this was a situation where the court on two occasions, knowing there was no 5K-1, and finding that the court determined that the only reason there was no 5K-1 was because of this government's conclusion that there was no 5K-1. This gets to the same place. It's like one person taking the bus from Cincinnati to Columbus to get there at 4 o'clock, another person taking a car that gets to Columbus at 4 o'clock. You took different vehicles, but you got to the same place at the same time. I'm still struggling with what the issue is here because he got what he wanted anyway, and the government was not required to give him a 5K-1. Show me where in the record, where in the agreement the government was required to give the 5K-1. Mandatory language. There is not mandatory language in the plea agreement. In fact, it says the government need not. Are those the words? Need not file for substantial assistance. Whatever. It's presumed reasonable, this sentence, is it not? It is presumed reasonable. Right. It's a low-guide-on sentence. So the steep hill that you have to climb here today, obviously the one that Judge Marley's focused upon, but we have to overcome the presumption? It is a sentence that's low-guide. It is conceivably both a steep and a high hill for Mr. Fields to climb. However, it's impossible, quite frankly, in the snow. I don't make the call. However, I would simply suggest that with respect to traveling to Cincinnati by bus or by plane, the only thing that I can say is without the 5K-1 and without the government's recommendation, which was required in the plea agreement if the 5K-1 was made, and the judges two or three times soliciting a recommendation or sentencing from the government that without the 5K-1 we cannot determine that Mr. Fields arrived, the judge arrived at the exact same sentence. You could also say that without the drug dealing from prison, you'd get a different result too. Well, the government made that point explicitly clear, but again, Mr. Fields' problem is that there was no real establishing of that in the courtroom. Indeed, that was something that bothered the government. I want to go back for a moment to the point that you made about maybe he gets a different sentence if the 5K is made. Didn't the government decline to recommend a sentence during the plea call? Yes, on more than one occasion. So, even if the government had moved for a 5K, sometimes the government could move for a 5K and not suggest the extent to which the court should vary. So, wouldn't we be in essentially the same position once again, even with the 5K made, that the government adhere to the same position that it was not going to recommend a particular sentence? No, because the potential 5K language in this plea agreement specifically stated that if the government moved for a 5K, it would recommend a sentence of 20 years or less. And so, there would have been a recommendation. And again, that's one of the unique situations about this. Thank you, Mr. Stangler. We'll get your phone number back later. Please, the court. My name is Marty McAfee, and I'm with the Memphis Bar. I represent Martin Lewis in this case, not Clinton Lewis in this case. We've got to keep him straight. I asked the jury to do that throughout the six-and-a-half-week trial. This was a very unique case. 28 days of testimony, 75 witnesses, 315 exhibits. The government portrayed this as a vast conspiracy. Respectfully, it's more likely that this was more likely many concentric conspiracies that the government would have to prove. And when you look at all the testimony regarding Martin Lewis, you find just weeks and weeks and weeks where there's no testimony. Martin Lewis did this, or did that, or was involved, or was there, or was guarding, or saw it, was delivering, dealing, any of that. Essentially, the case against Martin Lewis, when it comes to real witnesses and facts, regarded one of the several murders involved. Is this a build-up to the motion to sever it for me? Or where are you going with it? It goes towards both the severance. It goes towards the variance from the... Okay, well, on the severance, you know, I will say, I'm thinking about this case. I did have this point where there was a stage where I was saying to myself, it really does seem prejudicial to have these cases all together. Thank you. Yeah, no, you're right. But then I thought, I did use the word stage, and then I thought to myself, but wait, this is a conspiracy case. And how funny, that seems... I mean, if there's enough to have an indictment, that there was an agreement to do criminal business with somebody, I don't know, why shouldn't you be trapped together? I mean, I realize that conspiracies have bigger players and smaller players, and I get that, but it's still a conspiracy. How strange to have separate trials when there's, well, one conspiracy, or one set of conspiracies among a bunch of the same people. It's the set of conspiracies that gets terrible. When you prove for ten days that Mr. Capone did this, and for another ten days that this gangster did that, and another ten days that this gangster did that, and then you spend hours proving that Martin Lewis was involved in this far-flung... The reason that's not so bad is all you have to do to get out from under co-responsibility is say, I never ended the agreement. He never ended the agreement. If you do that, everything's irrelevant. But if you did end the agreement, then the bad consequences seem naturally to follow. Well, and honestly, I had abided, at least in my planning, to spend perhaps 14 or 15 seconds on severance. Okay, I'm sorry. I didn't want to let you know I had a good thought for you for the lie. You still can. Can you spend five more seconds on whether or not the government is correct that your severance argument receives only plain error review, inasmuch as it was not read? Well, it was brought up. I understand. Countless, countless, countless times pre-trial. It was brought up over and over during the trial. It was not renewed at that. So I do think I'm stuck with that. Okay, severance. Here we go. But just on severance and say this, the only way we get to your, but then I thought about this, is if you believe the witnesses they put on, which is why Brady matters so much here, and it's why the Perjury Testimony matters so much here, because that's really the only way we really have a trial. The bedrock that the whole system rests upon. Okay, so Perjury Testimony. I mean, I don't know. I felt like that had a really great caption. But then when you read it, you realize your theory of your Perjury Testimony is the government's putting on witnesses. And I guess it probably does count as Perjury Testimony if they're both saying opposite things. But what you had was the only time they were saying opposites was as to where the immaterial points. Points in the story that really didn't go to whether someone murdered somebody else in someone's direction. They went to whether someone was in the car at that point in time. Well, wouldn't you... I'm going to respectfully disagree on that. And I think if you, and I'm going to tell you, this is a sea of information. I mean, this is a record to tackle. And for y'all to get to it... Give us the one that really counts as perjured, and they'll respond. Okay, I'll do my best. With this, most of the really good variances that matter for me, for Martin Lewis' case, the government can't make it without Marcus Brandon. They can't make it without Terry Peete. They can't make it without Carlos Whitelow. Because their testimony is essentially that Carlos Whitelow sees Mario McNeil, says, he's over here, and he waits in a certain place until Martin Lewis is directed, driven over, and kills Mario McNeil. Driven over by Terry Peete, and then confesses about his actions to Marcus Brandon. Now, you're going to see the theme of those three names, Brandon, Peete, and Clinton Lewis, over and over in the testimony regarding Marcus Turner. Now, that is a separate murder in the government's vast conspiracy theory. But when you look at, when you break down what those three, really what all those witnesses around that murder had to say, they're not consistent, and clearly the government knew about that prior to trial. Is inconsistency the equivalent of falsity to equate to perjury? When one person says, he left with Marcus Brandon, Terry Peete, and Clinton Lewis, and we never saw him again, and that same, those two people that are in the car, other than Clinton Lewis, Marcus Brandon and Terry Peete, say, no, he left with other people, and I never saw him again, and the government has that information well ahead of time, and they know about it, and they've got them written down, and one's saying north, I'm certain north, and one's swearing south, I'm certain south, that is not just an inconsistency. An inconsistency is, where did I leave those keys? Was it in my blue suit, or was it in the tan suit? That's an inconsistency. There was a murder to explain here. Which one? Turner, I suppose. You're focused on Turner, I'm looking at that one. Well, that is, that's right, but when you look at all of the different testimony on this, first, you have to look at Marcus Brandon, because the government withheld information until after Marcus Brandon had testified. They had a DEA six where one of their witnesses, Marcus Cartwright, said that... Wasn't this the account that was acquitted? Yes, sir. Okay. Well, I didn't represent Clinton Lewis. Clinton Lewis was acquitted of that, and yet he was convicted by the jury verdict with the conspiracy behavior surrounding that, so those are inconsistent, too. But regardless of that, yes, it had to do with a murder that Martin Lewis was not even accused of, but these are all witnesses that are shared among this murderer and this murderer and this murderer, and when you can show to a jury inconsistencies, and you are entitled to do that before we should honor this jury verdict, you can't say, well, there's an acquittal on this, but Mr. McAfee, Martin Lewis was convicted of that. Didn't the jury take that away from our view? Weren't you given a chance to put the witness back in the stand? Yes, sir. Yes, sir, we were, and that mitigates this, but it doesn't give us back our opening statement, the credibility that we need before a jury when we're going into a trial, trying to guide the jury through 6 1⁄2 weeks of testimony,  that we've been told we do know is coming. If there's an opening statement of the practical matter, you might have a stronger case if Clinton Lewis had been found guilty of the murder, because rarely, if you're going to give an opening statement for what you know to be a six-week trial, are you going to deal with such minutiae as to say, well, Mr. Jones here will be impeached seven times when he went on cross-examination. You aren't going to tip your hand like that. You're just going to say, ladies and gentlemen, evaluate the credibility of the witnesses. You're going to throw a teaser out there, at least in the traditional opening sentence. I couldn't do that, because I was told over and over pre-trial, you've been given the decision. You've got it. We were told over and over prior to the trial, we've turned over all of Brady, we know what Brady means, and we will continue to follow that obligation, and yet, for three-and-a-half months, the change in Tomartha Cartwright's version... Listen back to the idea. We've gotten jinxed material. And you've done opening statements without having been given jinxed material before trial, right? But I can't get jinxed material after a witness that I want to cross-examine.  You don't know what's in the jinxed material. That's true. So it's not my... This is kind of analogous to the Brady situation, right? It is. And since there was no actual harm, or at least no harm that you pointed out thus far, from you getting the Brady material, and you were given the opportunity to cure him, what's the prejudice? We were prevented from curing him by not being allowed to put on Detective McKenzie, who could say, we have probable cause to indict Marcus Brandon, Terry Peet, and Clinton Lewis. We did indict them in Mississippi. And the government said, don't bring them back. Didn't they testify to that? Because wouldn't that be speculating as to what a grand juror would have done? He could say that they were indicted, and the reason that that's important is that it's yet another obligation that these witnesses owed to the government. Because the United States government went down to Mississippi and said, let them go, we'll take care of them. And Mississippi thought that what they meant was, we will prosecute them. What they meant was, we will take care of them. And they did take care of them. And the jury was entitled to know that they took care of them in that way. Because if you can say, Mr. McAfee, if you will say A, B, C, and D, and of course, I can't prove that they said that, and I don't think they said that, but I will say this, you take away the murder indictment that's between me and all of eternity, I'm your man. And that was our theory during this trial, and we were entitled to exploit it in every single way we could. And he's the only witness you, who could have testified to that, that you procluded from calling? Well, except we, well, there was also nearly ready mileage, we were limited on that, but frankly, we did anyway, and once I looked at the record, I admit, the government's right, that there's not much prejudice there. I just didn't want to concede it, because I don't want you to ignore it. Because the government did oppose what was clearly relevant to us. Two seconds, I better stop there. Well, now you look, it's gone. We've got, we're about to, Yes, sir. Thank you, Your Honor. My name is Jim Simmons, I'm from the Nashville Bar. I was involved in this case initially at pre-trial, and then for medical reasons, I had to leave before the trial started, and now we're at the Clinton list on the appeal. And I was listening to the argument, and why is this case different? And I think there's something that makes this case different from your typical conspiracy case in that it's a statement made by Marcus Brown that said on cross-examination, why do 10 when you can do a 3? That's what his father told him. That's what he admitted to on cross-examination. And that's the mindset of the vast majority of these witnesses, because this case was based almost entirely on cooperating witnesses. There was no DNA, there were limited phone taps, Is this a sufficiency point you're making here? No, Your Honor, it's a mindset. It's a mindset of all these witnesses. There's nothing improper about it. That's how conspiracies are tried. At least in my book. I think this case is different because usually the conspiracies are tried within cooperating witnesses plus. In this case, there's very little plus. There's incentive for the witnesses to testify based upon their expectations of my case. And they admitted it and they were thoroughly cross-examined as to their expectation of receiving some benefit for their testimony. And the fact that they were cross-examined cures a lot of that because then the jury has an opportunity to evaluate whether they trust their testimony or not. That's correct. But, I'm going to go back. In this case, I'm arguing cumulative error because I don't think you can take each individual issue that's raised and say that's reversible error. But, if you take the issue of the perjury testimony, is that inconsistent or is it perjury? I'm a little suspicious of the cumulative error theory. What do you mean by that? Do you mean that you could have something counts as reversible error on a scale of 1 to 10 when it's 9 or over? Hypothetically. You're saying you just get a bunch of 7s and you have 4 or 7 arguments and that gets you cumulative error even though none of them rose to 9 or 10? That is my understanding of the law, Your Honor, is that you can have a series of errors and among themselves individually do not amount to reversible error. But taking them as a whole in the aggregate, you do not have a fair trial. That's exactly what I'm saying. So all of them have to be errors? Yes. If they're not errors, then it's not going to be a cumulative error. I think the government points that out and I think that's logical. It's got to be errors first. So a difficult, harmlessness argument gets a little easier the more errors I get. The Brady violation, I'd like to go back to that because this is, again, it's the sequence of events where Mr. Cartwright was interviewed back in June of 2008. According to the government, he said he gave a gun, traded a gun with Clinton Lewis. He made arrangements for that gun to be put in the hands of law enforcement. The gun was, in fact, a murder weapon. And then he re-interviewed prior to trial in December, January, and again in February. And he says, no, I did not trade that gun with Clinton Lewis. I traded that gun with Mr. Brannon. Doesn't he say Clinton Lewis was there? Pardon me? Doesn't he say Clinton Lewis was there? In other words, even when he changes his testimony, it's not completely exculpated. According to Mr. Cartwright, he did not change his testimony. Cartwright said, I did not say that to the agency. The agency did, so who do you believe? The final version is still one that's not completely exculpated. That is not the way I'd rate the record because what he said is that it was Mr. Brady who had the gun that was traded with Mr. Cartwright. It was not Mr. Lewis' gun. It was a murder weapon. So yes, I think he is saying that Clinton Lewis was not involved in that gun. And the logical sequence is that gun, whoever traded the gun, was also the one who committed the murder. Doesn't he say Clinton Lewis was there during the exchange? Yes. Even though it was delayed and the government was going to have to answer for that, weren't you given the opportunity to recrawl both Brandon and Detective George? They were given the opportunity here and they offered not to do so. I think that was a decision of the trial counsel which they could take it back and do an effective process. Weren't you given an opportunity to also, did you get a chance to cross-examine Cartwright once you got Mr. Brady's gun? Cartwright was called into witness by Clinton Lewis. Okay. And at the conclusion of the government court. The government did not call Mr. Cartwright. He was called by Mr. Lewis. So the prejudice adhered in the delay itself. You also got to bring the materials and you were able to cross-examine Cartwright or examine Cartwright and you were given the opportunity to cross-examine Brandon and Detective George which is the same thing you would have been able to do had you gotten the Brady material in time, right? You would have had the opportunity but I think to effectively cross-examine them after he has already been cross-examined and the correct examination has already been finished at that point. Yes, you did have the opportunity but our position is it would not have had the same effect with the jury. Mr. Simmons, I see the red lights on but I think I want to give you guys some flexibility. You probably have five more minutes. Would that be all right? Okay. Go ahead. The point that Judge Cook brought up about in fact the Turner murder Mr. Lewis was acquitted of. The point is he was convicted of the kidnapping that resulted in his murder and that got him the last sentence. So the events at the kidnapping where we have the conflicting testimonies, what I think is critical to this, the acquittal the argument would have certainly been stronger as to the virgin testimony had he been convicted but thankfully wasn't convicted. But it shows that the jury considered this. The jury considered Mr. Brandon's alcohol false testimony, inconsistent testimony but Brandon was the key witness in this case and through this entire three eight week trial Brandon was the childhood person childhood buddy. They ran together they did everything together with Clayton Lewis. He is the critical witness against Clayton Lewis. He had a deal his, you know, why do ten when you can do it for him? That's his mindset. That's the mindset of everybody. But what's critical is the conflicting testimony that you had at the time of the abduction. You had Mark and Brandon's, you had Clarence Brody, White Love, Terry P all saying versions of the offense that simply are not correct as I would have liked. That's true in every detail. In every detail. This is what's tricky about this. You can have lots of perception issues where you don't remember this one feature of it, the other person remembers that feature of it, but if it doesn't go to the heart of it, that's the problem, right? It does go to the heart of it. Because these are not misperceptions of details. Give us the biggest one. He was naked. He was naked, he was bloody, he was put into the back of the van, and Mr. Brandon was present, he participated, and Mr. Brandon says, I slapped him and I never saw him again. The testimony was in Arkansas, I can get it back to the possession of Mr. Brandon. Mr. Brandon cannot be telling the truth when he says I had nothing else to do with it. Somebody is lying in this. Somebody is not a mistake, is not a misperception, it is somebody is lying, and the government in this case, offering five K's to everybody, is in fact vouching for the credibility of each of these witnesses. Okay, is there anything else you want to say? The set-ups issue, again, it was plain error, we're not going to see that, but in the transcript of this trial and the proceedings, I think over and over again you say the adversity between Clinton Lewis and Martin Lewis counsel. And the two examples of Mr. Whitelow recalled after he had been examined by the government, did not raise any issues pertaining to Mr. Lewis. He was cross-examined by Mr. Lewis counsel to Clinton Lewis counsel, who raised no issues regarding the abduction. And then he was cross-examined by Martin Lewis counsel, who at that point raised the issue of the abduction, and then the court allowed the proof to be reopened and proof put in, which would not have come in a second trial, as to Clinton Lewis and his culpability in the abduction and the murder. And the other is Vaishabal, again, after the close of all proof, Vaishabal was called by counsel from Martin Lewis who, again, talked about Clinton Lewis's participation in the abduction. And the government asked only, I think, three questions. Are you sure that it was Clinton Lewis who abducted Mr. Turner? And that was the sole cross-examination. I think there was undue prejudice about the failure to bring up Vaishabal, and we would want that issue to be considered. Okay. Thank you. We'll hear from the government. Mr. Lieberman, who are you? Is it one of you or both of you? Both of us, Your Honor. May it please the Court, Dave Lieberman for the United States and joined at the House table by Assistant United States Attorney David Pritchard. I will be addressing the claims related to the two Lewis defendants. Mr. Pritchard will be addressing the Demetrius fiends. Let me start off first with Judge Marbley's invitation to address the Brady group. This relates to the pre-trial statement of DeMarcus Cartwright. The defense argues that our disclosure was unduly delayed in volitive of Brady. As we said at the outset of our brief, that as a matter of our own expectations and our own policy, we should have disclosed sooner. And we've been completely candid about it. The question in this case is did our mid-trial disclosure violate the standards of Brady? And the answer is no. Brady requires disclosure at a time for which the defendants can make effective use of the evidence at trial. Mr. Lieberman, here is one of my concerns about the timing of the disclosure. The defense did not have those disclosures pre-trial. These are not jinks these are Brady's. And so in pre-trial I think by all accounts period because you prepare most of the persuasion is done or a great deal of it is done over the statements. They could have used these materials for the preparation of their opening. Why was this not disclosed? I would encourage the court to take a look at the transcript of the Brady hearing. That's document 1360. And our trial team lays out in full its explanation. Number one, they had initially planned to call Cartwright to the stand. Number two, they thought that his pre-trial statements were covered by Jenks. Can I just stop you on the first point? Is that right? That's an explanation? You're going to put someone on the stand? I understand why that helps you. So, what the trial team was looking at were a series of cases that this court has issued. Presser, Banks, and the one discussed below is an unpublished decision called Brazil where this court has said that where a statement falls under the Jenks Act and where the government intends to call that witness at trial the timing of the disclosure is defined by the Jenks Act. Now, we didn't call Cartwright to the stand and nothing in my brief and nothing in my argument today is relying on the Jenks Act. It's only Brady. And if Brady asks, going back to Judge Marbley's initial question to me, did we disclose in time for the defense to make effective use of this at trial? Now, on the point of crafting opening and closing arguments, this court in Banks says that when we're looking at Brady prejudice and materiality, we're looking at issues of guilt or innocence, not matters of trial strategy. But setting that point aside... I'm at a really simple place, but I can't get off of it. It just seems really obvious to me if it's Brady material that would otherwise help the other side, why is it at all relevant when you're going to call that person as a witness? They need that cross-examination and everything else. It just doesn't make any sense to me. I agree, Your Honor. The explanation that our trial team gave was based on statements that this court had made in Presser and Banks in Brazil. There was no prejudice because something else happened. I really said, well, if you're calling the witness, it doesn't matter, and that just doesn't make any sense to me. We needed to cross-examine the witness. So, the statement in Banks was, if it's covered by the Jenks Act, the Jenks Act overrides Brady with respect to the timing of the disclosure. Well, the majority of it was not I'm not relying on those cases. I'm not adopting the arguments in those cases. Isn't this all a prejudice? I just would have thought this is a prejudice issue, not a there was no Brady problem issue. Your Honor, the test of Brady is did we disclose in time for the defendants to make effective use of the trial? That's the question of whether a Brady violation occurred. The test of Brady and the requirements of Brady don't intersect under your paradigm because Brady is pre-trial disclosure and they filed a Brady motion. You are under an obligation not only to disclose from then, but to disclose it seasonably. I guess you could argue that but seasonable disclosure is not related to government trial tactics and strategy. It means when you discover, if you don't have it when it's asked for, but you later come into possession of it, that's seasonable disclosure. You had it when they asked for it. You made a tactical decision not to disclose it because it gave you a benefit to disclose it later as a chance. So what do we do when you do something like that? Discourage you from doing it again because I know that you know that that was wrong. And that's why we contended with the court at the outset that this should have been disclosed earlier. The situation, and it could be misremembering, but the situation that we have here is actually very similar to the facts in banks. I believe in that case there was a pretrial statement given by one of the government's witnesses saying that he did not remember the defendant being involved in the drug deal. And that's where the entire line of arguments that our trial team was relying on came out of the bank's case. I am not relying on those arguments here. The question under, and I know we're engaging Can I just ask you something? Tell me what is wrong with this way of thinking about the case. You do not need to address whether there was a barrier to violation to find that there was no prejudice. I completely agree with that. It sounds like you're asking us to split a lot of hairs and lines that aren't intuitive to me. And the other part of it seems incredibly easy. I was trying to address... No, I'm not complaining. I'm just putting a question. I get my question. My question is why am I bothered with this? Why should I bother with this when I have a prejudice inquiry as well? You don't have to bother with it. You can focus entirely on the materiality crime to resolve the disputes here. The materiality crime being the defendants must show a reasonable probability that had we disclosed this sooner, the results of the proceeding would have been different. And I have not heard any fact, any argument, any piece of evidence or testimony that was not presented to the jury as a result of our mid-trial disclosure. And I have not heard any argument linking any of the counts of conviction that either of these defendants faced to Cartwright's statement. I'll walk through both the defendants one by one. Martin Lewis. Cartwright's statement addressed the .45 caliber handgun used to kill Turner. Martin Lewis was not in any way inculcated in that episode. We didn't charge him with that, never alleged that he participated in that. So the statement is unquestionably irrelevant to the jury's assessment of his culpability. Now, Clinton Lewis, this was one of the members of the panel brought up earlier, this statement bore directly on count three, the murder of Turner in Ada Rapturing, and the jury acquitted on that. I think at this stage, I feel it's up to the other side to come in. I agree wholeheartedly with what Judge Sutton has said, and I agree with your analysis. I have a different concern, however. I don't want to see us eviscerate Brayden with death by a thousand cuts. Because the district court was sage enough to remedy the mistake that you created by this late Brayden disclosure. As a district judge, and I think as a court of appeal, we have an interest in Brayden not being eviscerated. So what can we do to ensure that this doesn't happen again? Your Honor, when you write your opinion, you're completely free to repeat the government's concession here, that we should have disclosed this earlier. And that our failure to do so, while regrettable, did not violate Brady. In terms of all the analysis, including the materiality analysis, we have been very forthright that this was exculpatory and that we should have disclosed pre-trial. And I'm not sure what more I can offer you. I can also say that this is something that the department and the U.S. Train, this case, treats very seriously, and the U.S. Train has individually addressed this episode with members of the trial team. I'm satisfied with your explanation. Thank you. You may move on to another issue. Okay, thank you, Your Honor. If I could move on to the claim that the government presented a perjured testimony. Counsel, my friend on the other side for Clinton, Lewis, focused on the testimony related to the Turner kidnapping. The government had two main witnesses, Clarence Brody and Demetrius Beutels, which walked through each step of how Turner was abducted from the streets of Memphis, driven around for two days in a van, and then dropped off at his stash house, and he was later killed. Both Brody and Beutels implicated Marcus Brandon in the abduction. Was the counsels right? We did call Marcus Brandon to the stand. Marcus Brandon says, I was there at the initial abduction, but I wasn't a part of it. I saw them, actually slapped the victim, and then I walked away. So that is the discrepancy. It's a degree of participation. Brody and Beutels thought that Brandon was centrally involved. Brandon admits he was there, says he played a minor role in it, and did not otherwise participate in that. That's a discrepancy. That is something that defendants are allowed to use, and they did use, to try to impeach Marcus Brandon's credibility at trial. But it does not establish perjury. Of course, including this court, has said that inconsistencies in government testimony do not amount to perjury. The defendants have an additional burden. They have to show materiality. What did these discrepancies regarding the testimonial recording, what did these discrepancies, or how did these discrepancies affect the verdict? And the answer is very hard to see in this case, because although we had a number of witnesses, and some of them had individual discrepancies as to who the secondary players were, everybody said that Clinton Lewis was involved. Everybody. There's no discrepancy on that one. And then the final point, on any claim that the government has sworn perjury, they have to show that we knew that we were doing this. And again, courts have been very clear that the fact that we have witnesses who offer inconsistent statements, we will not impute knowledge of perjury, knowledge of falsity to the government. This is what trials are for. Sometimes our witnesses do not, their memories do not align completely. We present our case, and we leave it up to the jury to decide. The district court here, Judge Mays, gave very extensive instruction to the jury as to how to evaluate credibility, and there's every reason to believe that the jury... What would you say about the variance argument? Well, first I would say it's not preserved. There was no claim at trial about variance. And so we're here after plain error. The second point that I would say about variance is that the standard for the defendants is exceedingly high. They have to show that a variance only occurs when the trial evidence can only be construed as showing multiple conspiracies. It's sort of like a sufficiency standard. They have not met that burden, and that's really hard to do. Why isn't it just a sufficiency test? I think people's eyes glaze over when they hear the word variance, but they don't glaze over when they hear the word sufficiency. I think it is very much a class-based sufficiency test, in a light that's favorable to the government. But there's a third obstacle. So, if here there's a global conspiracy alleged, the claim of variance is no, there wasn't. There were lots of many conspiracies. You're saying it's a complete variance response to show that there was sufficient evidence to show the global big conspiracy. That ends the discussion. Yes, and it's actually really hard to find a successful variance objection in a RICO case. I haven't found one. And that's because this is not an ordinary 841 drug distribution. Is this a single chain, or is this a web? When Congress passed RICO, it designed to target conspiracies to engage in enterprises that were involved in multifaceted racketeering activities. So one person may be involved in drug trafficking, one person may be involved in kidnapping. There's a whole list of them in the statute. And the question is, have we connected it back up the line to the enterprise? And the answer here is clearly yes, by all of this court's guideposts. Everybody here had a common goal. They were working for the Pettus organization to traffic drugs throughout the southeastern United States. The nature of the scheme was incredibly complex and interlocking. We had to get the drugs from Mexico, across the border to Memphis. We needed truck drivers, people to unload the trucks, people to distribute the money to stash houses and get it out to the community. Security, like Martin Luther, to protect the organization's interests, and then get the money back to Mexico. The government detailed where each defendant in this case, where they fell into that line. And then the third point is similar to the same thing. The participants overlapped here because this is all about moving the product down the line to the consumer. By all those guideposts and under a variance standard, a sufficiency standard, and under plain error review, this conviction on count one should stand. I think we understand your arguments as to the Lewises. Is there anything else you feel compelled to say based on what the defense on the other side have said? I am happy to rest of my brief for all the other claims and turn it over to my colleague. Okay, thank you, Mr. Lewis. Thank you. So, is it Mr. Kutcher? It is you. So, I wonder if you heard some of the questioning from the bench on the fields of appeal. I did, and I don't really have anything to add. I'm happy to allow my brief and Mr.'s questions. That's an excellent idea. Thank you. All right, your rebuttal. Since the government submitted it, I've got nothing specific to rebut. As far as argument, it was submitted. Okay, thank you. Mr. McAfee, you want to go next? Thank you, Your Honor. What really happened to Marcus Turner? He was abducted, beaten, hauled to a house in a car, driven around for two days, and then he was tied up, ridiculed, beaten some more, left on the floor, and ultimately put into a van again by someone, taken to Mississippi, or killed in Tennessee and taken to Mississippi, or taken to Mississippi and killed. Somebody abducted him, held him, hurt him, and killed him. Here are the small discrepancies. Mr. Brannon says, well, I witnessed the abduction. Saw Clinton... In your theory, is it one person who did all of those steps? Well, if you listen to the different versions... You said somebody did. No, no, you're right. Maybe a different person did. This aspect, we know the slapping occurred. You are right. I don't mean to... I don't mean to minimize anything anyone did in this. In fact, what I want to do is point out that that's what each of these people are testifying to. Brannon says, well, I witnessed the abduction, saw Clinton beat him, never saw Turner again. Law enforcement, prior to trial, did confront Mr. Brannon with the fact that the other witnesses were saying different things. Now, anyone that's ever practiced law dealing with U.S. attorneys knows that that usually means you're invited to leave with your client when they're minimizing their conduct. What does Mr. Brody say? He says, Clinton Lewis, Faishavon, Marcus Brannon abducted this man, hauled him to a van. Brody turned Turner over to Clinton Lewis, Marcus Brannon, and Terry Peete. Mr. Whitelow admitted that he participated in the abduction, released Turner to Terry Peete and Marcus Brannon. Mr. Peete says, not involved in the Turner was released to Clinton Lewis and Marcus Brannon. I was not involved in the killing. All of those things have to do with Marcus Turner's abduction, and they are, every one of them, trying to minimize what they themselves did when it comes to this horrendous crime to Marcus Turner. But these are also witnesses that are essential to the government's case against Martin Lewis. And so, when you ask, why does this matter when these inconsistencies, as the government puts them, one of them is telling the truth about it, and one of them is not. There are several different... But they knew about it before the trial, and they put it on. When you put a witness on that you know is telling something false, then you're supporting perjury. If the question is, was the light yellow or was it red, that's inconsistent. If it is, Mr. McAfee, were you there holding the pistol, and one says yes and one says no, that's not an inconsistency anymore. I wasn't there during the induction, I wasn't there during the torture of him, and I wasn't there during the killing. Mr. Pete is lying, or these other witnesses are lying. One of those two things is both inconsistent and perjury. And if we're going to believe that this system is going to make sense, we have to rely upon... There's not cameras everywhere. We don't have it. And the only thing you can do is to take what juries find with sworn testimony, because it's supposed to be meaningful when you put your hand on the Bible and swear to it. And that's only meaningful if we are sifting before we ask the jury to just sift through these things. It's not good enough to say, well, I know they had a lot to look at over that six and a half weeks, but the jury blessed it so we're done, and it's just inconsistencies. Yes, that is good enough when it's... Well, I can't remember if his suit was... Was it navy? Was it dark blue, or was it black? That's an inconsistency. But if one of you says, Mr. McAfee argued before me today, the other one says, well, he didn't make much of an argument, and the other of you says, he wasn't there at all, that's not inconsistent. It's wrong. One of them's wrong. Well, it also too depends on the matter of perception. If I'm colorblind, you know, I might think it's green. Your son might think it's gray, just blue. We're just inconsistent. And I agree. It's red. Yeah. Okay, I agree that that would just be inconsistent, but Marty isn't here. One of them's wrong. Thank you. All right. Thank you, Mr. McAfee. Appreciate it. Mr. Simmons, do you want to... Yeah, I have nothing Thanks to all five of you for your arguments, some longer than others. We appreciate it. Thank you for the briefs. And Mr. Spangl, Mr. McAfee, Mr. Simmons, I see you're all three-quarter-pointed, which we really are grateful for. I hope your clients are grateful for it. It's a real benefit to us and to the system. We did this when we were in practice, and we realized how little we paid for it. Thanks very much for what you guys did. Great work. Thank you.